**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

DANIEL DANDOR,                          :
                                        :    Civil Action No. 09-1565 (KSH)
           Petitioner,          :
                                        :
           v.                   :    **OPINION**
                                        :
MICHELE RICCI, et al.,                  :
                                        :
           Respondents.     :

**APPEARANCES:**

           DANIEL DANDOR, Petitioner <u>pro</u> <u>se</u>
           #432529/SBI# 367671C
           New Jersey State Prison
           P.O. Box 861
           Trenton, New Jersey 08625

           DEBRA GRACE SIMMS, ESQ.
           ESSEX COUNTY PROSECUTOR'S OFFICE
           50 West Market Street
           Newark, New Jersey 07
           Counsel for Respondents

**HAYDEN**, District Judge

     Petitioner Daniel Dandor, a convicted state prisoner, has

submitted a petition for a writ of habeas corpus pursuant to 28

U.S.C. § 2254, challenging his New Jersey state court conviction

and sentence.  For the reasons stated herein, the Petition will

be denied for lack of substantive merit.

I.  <u>BACKGROUND</u>

A.  <u>Statement of Facts</u>

The facts of this case were recounted below and this Court, affording the state court's factual determinations the appropriate deference, <u>see</u> 28 U.S.C. § 2254(e)(1), will simply reproduce the factual recitation as set forth in the unpublished opinion of the Superior Court of New Jersey, Appellate Division, decided on October 8, 2004, with respect to petitioner's direct appeal from his judgment of conviction and sentence:

> The charges arose out of the murder of the sacristan of the Grace Episcopal Church in Newark on August 9, 1998. At 7:30 that morning, Tralynn Brown arrived at the church to drop off her son who was participating in a service later that morning. The church sacristan, seventy-one-year-old Roger Mook, was at the church preparing for services when Brown and her son arrived. After leaving her son at the church, Brown left to go grocery shopping. When she returned, she saw a man coming out of the church door with blood dripping from his hand. Brown passed the man face-to-face and described him as a black male in his early twenties wearing a blood stained shirt, baggy blue jeans, a green baseball cap and dark brown boots. After the man passed her, she saw him take off the blood-stained shirt as he walked away. Brown noted that the shirt was navy blue, V-neck, short sleeve, with grey and white trim. When Brown reached the door, she found it locked and noticed blood on the doorknob. She banged on the door and heard someone saying, "Help me, help me!" When someone finally opened the door, Brown saw several people in Mook's office. Among the people in the office was Hyacinth McCauley, who said that during the service she heard someone moaning, went to Mook's office with another person and found Mook lying on the floor. Mook told McCauley he had been stabbed. When McCauley opened Mook's shirt to take his pulse, she saw six stab wounds. The police were called and the ambulance arrived shortly thereafter. Mook later died of his wounds.
>
> Brown told the police about the man she saw leaving the church, and the police took her to the area where the Puerto

2

Rican Day parade was being held to see if she could identify
him in the crowd.  When she could not, she was taken to
police headquarters and shown photos but was unable to
identify the man she saw coming out of the church.  A police
artist prepared a sketch in accordance with Brown's
description.

    In the early morning hours of August 10, the day after
Mook was stabbed, an individual who identified himself as
"Thomas Parker" arrived at Newark Beth Israel Hospital in a
cab.  The cab driver approached Ray Ates, a security guard
on duty at the door, and told Ates that his passenger needed
help.  Defendant got out of the cab, wearing a blue shirt
and jeans.  He had a bloody T-shirt wrapped around his wrist
and was covered in blood.  "Thomas Parker" told Ates that he
had tried to kill himself.  Ates took him to the triage unit
where a knife and box cutter were found in defendant's
jeans.  A week later, the police presented Ates with a photo
array from which he identified a photo of defendant as the
man who had arrived in the cab.

    While "Thomas Parker" was being treated for his
injuries, which included a punctured lung and lacerations on
his neck and wrists, he was attended by Robert Sosnicki,
R.N.  Later that evening, defendant was watching the six
o'clock news on television while Sosnicki was changing an
I.V. bag for him.  When the story about Mook's murder was
shown, defendant quickly changed the channel, and an EKG
alarm sounded, indicating that defendant's heart rate had
soared to 177 beats per minute.  Sosnicki was concerned and
asked defendant if he was having chest pains, shortness of
breath or dizziness.  Defendant calmly responded that he was
not in pain or distressed.  Sosnicki became suspicious,
however, because the spike in defendant's heart rate seemed
to occur when defendant saw the television news report of
Mook's murder.  Sosnicki became more suspicious when a
visitor stopped by defendant's room and called him "Dan."
When Sosnicki told defendant he thought his name was "Thomas
Parker," defendant said, "Well, yeah, that's a fictitious
name."  Acting on his suspicions, Sosnicki alerted hospital
security who, in turn, contacted the Newark police.

    The next day, Newark Detective Rashid Sabur went to the
hospital to question defendant.  Defendant told Sabur that
his name was "Thomas Parker" and gave an incorrect date of
birth, social security number and address.  Defendant told
Sabur that he was in the hospital because he had done
something stupid and tried to kill himself.  Sabur asked

defendant if he would talk about the stupid thing he had done and defendant agreed.  Before discussing the incident, however, Sabur asked defendant if he would permit a nurse to be present in the room as they talked about it.  Defendant initially agreed but later said he was too ashamed and uncomfortable speaking with the nurse in the room, and she was asked to leave.

Defendant then spoke to Sabur and initially denied being in Newark on August 9 but later admitted that he was. He told Sabur that he cut himself in Irvington Park, although a later investigation disclosed no evidence of a suicide attempt at that location.  When Sabur asked about the clothes defendant was wearing on the morning of August 9, defendant pointed to the clothes in his hospital bag which matched the description given by Tralynn Brown.  At that point, Sabur read defendant his <u>Miranda</u> rights[1] and defendant waived them verbally.  When Sabur asked defendant if he knew anything about the murder at the church, defendant said he was tired and wanted to go to sleep. Sabur stopped questioning defendant and was about to leave the hospital.  In response to defendant's inquiry, Sabur gave defendant his pager number in case defendant wanted to get in touch with him.

At 4:30 a.m., defendant paged Sabur, saying he wanted to talk.  By the time Sabur returned to the hospital, he had run a check on "Thomas Parker" and told defendant that he found that "Parker" had been arrested on a prior occasion. Defendant later admitted that he was Daniel Dandor.

Defendant told Sabur he was expecting the police to come and see him sooner or later.  He told Sabur that he was a high school graduate and had attended three years at Rutgers where he studied mathematics before dropping out. When Sabur asked if defendant heard anything about an incident at the church, defendant became upset and started to cry.  Sabur asked why he was crying, and defendant said he did not know.  Sabur stopped questioning defendant and left the hospital at that point, but took a photo of defendant before leaving.  Sabur subsequently put defendant's picture into a new photo array and showed it to Brown.  Brown immediately identified defendant as the person she saw leaving the church on August 9.

---

[1]  <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

4

Sabur returned to the hospital on August 14 to interview defendant further.  After reading the <u>Miranda</u> warnings, defendant signed a written waiver of his rights and gave a statement admitting that he killed Mook with a box cutter.  He said he did not know Mook and had no reason for killing him.  He stated simply, "I don't know, I just lost it."  Defendant also admitted attempting suicide because of his attack on Mook and indicated he had used the same box cutter on Mook and himself.  Defendant then told Sabur he did not want to continue and Sabur ended the interrogation.

At trial, defendant did not testify, but his sister and mother both testified that prior to Mook's murder, defendant appeared distressed and had talked about suicide because he was having difficulties in school and because his mother was involved in an abusive relationship which caused her to go to Florida for her safety.  Defendant's mother testified that she was a former member of the Grace Episcopal Church and that defendant had accompanied her to the church on at least one occasion before the murder.

Geoffrey Loftus, Ph.D., testified at trial on behalf of defendant as an expert witness in the area of human perception and memory.  Loftus attacked Brown's testimony because Brown "had a relatively short period of time during which she was actually able to see the culprit's face."  He estimated that Brown observed the man coming out of the church for approximately three seconds, during which she was distracted because she was late to pick up her son, saw blood on the hand of the man coming out the door and heard someone crying for help inside.  According to Loftus, the distraction affected Brown's memory, rendering her unable to identify defendant as the culprit.  On cross-examination, Loftus acknowledged that it was up to the jury to determine Brown's credibility.

The jury found defendant guilty of first degree murder and the weapons charge.

(Re U,[2] October 8, 2004 Appellate Division Opinion at pp. 2-8).

---

[2] "Re" refers to the state court record exhibits provided by the respondents as follows:

Re A Transcript dated March 27, 2001
Re B Transcript dated March 28, 2001

B.  <u>Procedural History</u>

On November 19, 1998, an Essex County Grand Jury indicted petitioner, Daniel Dandor ("Dandor"), under Indictment No. 98-11-4563.  The Indictment charged Dandor with purposeful and knowing murder (count one), second-degree burglary (count two), felony murder (count three), fourth-degree unlawful possession of a weapon, a knife (count four), and third-degree possession of a

Re C Transcript dated April 5, 2001
Re D Transcript dated January 3, 2002
Re E Transcript dated January 4, 2002
Re F Transcript dated February 4, 2002
Re G Transcript dated February 5, 2002
Re H Transcript dated February 6, 2002
Re I Transcript dated February 13, 2002
Re J Transcript dated February 14, 2002
Re K Transcript dated February 25, 2002
Re L Transcript dated February 26, 2002
Re M Transcript dated March 4, 2002
Re N Transcript dated March 5, 2002
Re O Transcript dated March 6, 2002
Re P Transcript dated March 7, 2002
Re Q Transcript dated March 14, 2002
Re R Sentencing Transcript dated May 3, 2002
Re S Petitioner's Brief on direct appeal, dated May 31, 2003
Re T State's responding brief, dated March 5, 2004
Re U Petitioner's brief on appeal from denial of state post-conviction relief ("PCR") petition, dated October23, 2007 (including  Appellate Division Opinion on direct appeal, dated October 8, 2004; January 18, 2005 Order of New Jersey Supreme Court denying certification; letter opinion and order of state PCR court denying PCR petition, dated March 12, 2007)
Re V State's responding brief, dated February 21, 2008
Re W October 8, 2008 Opinion of Appellate Division
Re X Petitioner's petition for certification to the New Jersey Supreme Court, dated October 9, 2008
Re Y State's letter opposing petition for certification, dated October 30, 2008
Re Z December 2, 2008 Order of New Jersey Supreme Court denying certification

weapon, a knife, for an unlawful purpose (count five).  (Re U, Indictment at Da 1-6).

On March 27, 28 and April 5, 2001, the Honorable Peter J. Vasquez, J.S.C., heard and subsequently denied Dandor's motion to suppress his statement.  A jury trial was held before Judge Vasquez on April 9, 2001.  On May 2, 2001, after the close of the State's case, the court dismissed counts two and three (second degree burglary and felony murder) upon Dandor's motion.  A mistrial was declared on May 7, 2001, when a juror told the other jurors on the panel that she knew Dandor and felt he could not be guilty.  (Re U at Da46).

Dandor was retried before Judge Vasquez and another jury, from February 13, 2002 to March 14, 2002.  He was found guilty of murder (count one) and possession of a weapon (count five) and acquitted of unlawful possession of a weapon (count four).  (Re Q, March 14, 2002 trial transcript at page 43:line 18 - 45:6). Judge Vasqez heard and denied Dandor's motion for a new trial on May 2, 2002.  Dandor was sentenced on May 3, 2002 to thirty (30) years in prison with a 30-year parole disqualifier.  A concurrent term of six months on the weapon conviction also was imposed. (Re R, May 3, 2002 sentencing transcript at 32:14-25).

Dandor appealed his conviction and sentence to the Superior Court of New Jersey, Appellate Division.  On October 8, 2004, the Appellate Division affirmed the judgment of conviction.  (Re U at

Da10-31).  The Supreme Court of New Jersey denied Dandor's petition for certification on January 19, 2005.  (Re U at Da32).

On August 18, 2005, Dandor filed a state PCR petition, raising a claim challenging the admissibility of his statement to the police.  On February 1, 2007, Dandor's appointed counsel filed a supplemental brief raising claims of ineffective assistance of trial and appellate counsel.  On March 8, 2007, the Honorable Michael C. Ravin, J.S.C., heard oral argument on the PCR petition.  Judge subsequently denied the PCR petition and Dandor's request for an evidentiary hearing, by letter opinion and order, dated March 12, 2007.

Dandor appealed from denial of his state PCR petition.  The Appellate Division affirmed by Opinion filed on October 8, 2008. (Re W).  The New Jersey Supreme Court denied certification by Order dated December 2, 2008.  (Re Z).

Dandor filed this habeas petition pursuant to 28 U.S.C. § 2254, on or about March 20, 2009.  The State filed a response to the petition on December 1, 2009, with the relevant state court record.  Dandor filed a reply/traverse on January 20, 2010.

## II.  STATEMENT OF CLAIMS

Dandor asserts the following claims in his petition and amended petition for habeas relief:

A.  Petitioner's right to due process was violated by introduction of his involuntary and coerced statement. (Petition, Ground one).

B.  The State failed to sustain its burden of proof.  (Pet., Ground two).

C.  Robert Sosnicki's improper testimony at trial as an expert witness deprived Petitioner of due process.  (Pet., Ground three).

D.  Ineffective assistance of trial counsel in failing to adequately elicit exculpatory evidence.  (Pet., Ground four).

E.  Ineffective assistance of trial counsel in failing to call a favorable witness.  (Pet., Ground five).

F.  Ineffective assistance of trial counsel for inducing Petitioner not to testify at trial.  (Pet., Ground six).

G.  Ineffective assistance of appellate counsel.  (Pet., Ground seven).

The State essentially contends that the petition should be denied for lack of substantive merit or because it fails to raise claims of federal constitutional dimension.  The State also argues that petitioner's claim concerning the admission of his statements is procedurally defaulted.

The State did not raise the affirmative defense that the petition is time-barred, and the Court finds that the petition was timely filed.  Additionally, it appears that all claims

raised by Dandor have been exhausted in his state court proceedings.

### III.  <u>STANDARD OF REVIEW</u>

A pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976); <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972). A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  <u>See</u> <u>Royce v. Hahn</u>, 151 F.3d 116, 118 (3d Cir. 1998); <u>Lewis v. Attorney General</u>, 878 F.2d 714, 721-22 (3d Cir. 1989); <u>United States v. Brierley</u>, 414 F.2d 552, 555 (3d Cir. 1969), <u>cert. denied</u>, 399 U.S. 912 (1970).  Because petitioner is a <u>pro</u> <u>se</u> litigant, the Court will accord his petition the liberal construction intended for <u>pro</u> <u>se</u> petitioners.

Section 2254(a) of Title 28 of the United States Code gives the court jurisdiction to entertain a habeas petition challenging a state conviction or sentence only where the inmate's custody violates federal law.  28 U.S.C. § 2254(a).

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); 28 U.S.C. § 2254(a); <u>accord</u> <u>Barry v. Bergen County Probation Dep't</u>, 128 F.3d 152, 159 (3d Cir. 1997).  "Federal courts hold no supervisory authority over state judicial

10

proceedings and may intervene only to correct wrongs of constitutional dimension." Smith v. Phillips, 455 U.S. 209, 221 (1982). Generally, "[i]f a state prisoner alleges no deprivation of a federal right, § 2254 is simply inapplicable," Engle v. Isaac, 456 U.S. 107, 120 n. 19 (1982), and "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." Bradshaw v. Richey, 546 U.S. 74, 76 (2005).

In reviewing a § 2254 petition, a federal court is not permitted to address a federal constitutional claim pertinent to the facts of the case unless the petitioner asserts the claim as a ground for relief. That is, "errors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause." Johnson v. Rosemeyer, 117 F.3d 104, 110 (3d Cir. 1997). In addition, "it is well established that a state court's misapplication of its own law does not generally raise a constitutional claim." Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997)(citations and internal quotation marks omitted); see also Smith v. Zimmerman, 768 F.2d 69, 71, 73 (3d Cir. 1985).

In addition to the case law, the Antiterrorism and Effective Death Penalty Act ("AEDPA") limits a federal court's authority to grant habeas relief when a state court has adjudicated petitioner's federal claim on the merits. See 28 U.S.C. §

11

2254(d).  Where a federal claim was "adjudicated on the merits"
in state court proceedings, the writ must be denied unless
adjudication of the claim either involved an unreasonable
application of clearly established federal law, or was based on
unreasonable determination of the facts in light of the evidence
before the state court.  See 28 U.S.C. § 2254(d).

The unreasonableness standards of § 2254(d) govern only
claims that were "adjudicated on the merits in State Court
proceedings."  28 U.S.C. § 2254(d).  "An 'adjudication on the
merits' has a well settled meaning: a decision finally resolving
the parties' claims, with res judicata effect, that is based on
the substance of the claim advanced, rather than on a procedural,
or other, ground."  Rompilla v. Horn, 355 F.3d 233, 247 (3d Cir.
2004)(citations and internal quotation marks omitted), reversed
on other grounds sub nom. Rompilla v. Beard, 545 U.S. 374
(2005); see also Rolan v. Vaughn, 445 F.3d 671, 678 (3d Cir.
2006).  A state court may render an adjudication on the merits of
a federal claim by rejecting the claim without any discussion
whatsoever.  See Rompilla, 355 F.3d at 247.  See also Chadwick v.
Janecka, 312 F.3d 597, 605-06 (3d Cir. 2002), cert. denied, 538
U.S. 1000 (2003)(citing Weeks v. Angelone, 528 U.S. 225, 237
(2000)(even a summary adjudication by the state court on the
merits of a claim is entitled to § 2254(d) deference)).  On the
other hand, "[i]f the petitioner's legal claims were presented

but not addressed by the state courts, 28 U.S.C. § 2254(d) does not apply." Rolan, 445 F.3d at 678. See also Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000)(with respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment), cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL 1523144, *6 n.4 (D.N.J. 2000).

If the New Jersey courts adjudicated the petitioner's claims on the merits, this Court may not grant relief unless either § 2254(d)(1) or § 2254(d)(2) is satisfied. See 28 U.S.C. § 2254(d). Accordingly, this Court may not grant habeas relief to the petitioner unless the adjudication of a federal claim by the New Jersey courts involved an unreasonable application of clearly established Supreme Court law, see 28 U.S.C. § 2254(d)(1), or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding and Adamson is in custody in violation of the Constitution or laws or treaties of the United States. See 28 U.S.C. § 2254(a), (d)(2).

When the grounds raised in the petition are governed by 28 U.S.C. § 2254(d)(1), the court must begin its analysis by determining the relevant law clearly established by the Supreme Court. See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004). Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of

13

the relevant state-court decision." <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000).  A court must look for "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71, 72 (2003).

A decision is "contrary to" a Supreme Court holding within 28 U .S.C. § 2254(d)(1), if the state court "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." <u>Williams</u>, 529 U.S. at 405-06.  Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Id</u>. at 413. Whether a state court's application of federal law is "unreasonable" must be judged objectively; an application may be incorrect, but still not unreasonable.[3] <u>See</u> <u>id</u>. at 409-10. "The unreasonable application test is an objective one-a federal court may not grant habeas

_____

[3] <u>See</u> <u>also</u> <u>Marshall v. Hendricks</u>, 307 F.3d 36, 71 n. 24 (3d Cir. 2002)("[D]ecisions of federal courts below the level of the United States Supreme Court may be helpful to [a court] in ascertaining the reasonableness of state courts' application of clearly established United States Supreme Court precedent, as well as helpful amplifications of that precedent.")(citations and internal quotation marks omitted).

relief merely because it concludes that the state court applied federal law erroneously or incorrectly." Thomas v. Varner, 428 F.3d 491, 497 (3d Cir. 2005) (quoting Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005)).

Finally, federal courts are required to apply a "presumption of correctness to factual determinations made by the state court." Id.; see also 28 U.S.C. § 2254(e)(1). The Third Circuit has ruled that this presumption of correctness based upon state court factual findings can only be overcome by clear and convincing evidence. See Duncan, 256 F.3d at 196 (*citing* 28 U.S.C. § 2254(e)(1)). Consequently, a habeas petitioner "must clear a high hurdle before a federal court will set aside any of the state court's factual findings." Mastracchio v. Vose, 274 F.3d 590, 597-98 (1st Cir. 2001).

## IV. ANALYSIS

### A. Claim As to Admission of Dandor's Statement

Dandor asserts that his rights to due process and a fair trial were violated when the trial court failed to suppress his allegedly involuntary and coerced statement to the police at trial. Dandor alleges that his statement was taken while he was in the hospital after an attempted suicide, and while he was in a depressed mental state due to a number of circumstances in his life. Dandor states that he was under 24-hour supervision by uniform police officers, and questioned frequently by police over

a four-day period.  He claims that his three-page statement was given over the course of five and a half hours of questioning by police, and that his statement contains incorrect information that the victim was killed with a box cutter.  Dandor raised this argument on direct appeal.  After a thorough review of the testimony and evidence at trial, the Appellate Division rejected the claim as follows:

> At the Miranda hearing prior to trial, Detective Sabur testified that when he initially broached Mook's murder with defendant, defendant became upset and started to cry.  Sabur immediately stopped questioning him and left the hospital. The second time Sabur went to the hospital, he recognized Sabur's clothes as the clothes Brown had described and immediately read the Miranda warnings to defendant. Defendant acknowledged that he understood his rights, and as soon as defendant said he was tired and wanted to sleep, Sabur stopped questioning him.  As Sabur was leaving the hospital, defendant asked him how he could contact Sabur if defendant wanted to speak to him.  Sabur gave defendant his pager number and left the hospital.
>
> Defendant initiated the next contact when he paged Sabur at 4:30 a.m. the next morning.  When Sabur arrived at the hospital, he first asked defendant if he was taking any medications.  Defendant said he was on pain medication. Defendant remembered his conversation with Sabur the day before and remembered hearing his Miranda rights.  Defendant again acknowledged that he understood those rights.
>
> Sabur described defendant as fully alert.  He told defendant he had run a check on "Thomas Parker" and found that "Parker" had a criminal record and an outstanding warrant for his arrest.  Defendant denied having a criminal record, and Sabur went into the hallway to make a telephone call to verify the criminal record.  While he was on the phone, twice he called to defendant using the name "Thomas." Defendant did not respond.  When Sabur returned to defendant's room and asked why he had not responded, defendant said his name was not "Thomas Parker" but Daniel Dandor.

16

Sabur again advised defendant of his <u>Miranda</u> warnings and
emphasized that defendant had the right to an attorney
during the interview.  Defendant said he understood his
rights and told Sabur that he had attended three years of
college and majored in math but did not graduate because he
had failed a class.  He claimed that failing the class was
one of several reasons he attempted suicide.  He further
indicated that he had done something he was not proud of and
wanted to talk about it.  When Sabur asked defendant what he
had done, defendant began to cry.  Sabur ceased questioning
him and left the hospital.

Sabur returned later that day and again advised defendant of
his <u>Miranda</u> warnings.  This time, defendant signed a written
waiver of rights before giving a statement concerning Mook's
murder.  In his statement, defendant admitted killing Mook
but said he did not know why.

Kenneth Weiss, M.D., testified at the <u>Miranda</u> hearing on
behalf of defendant as an expert in pharmacology and
forensic psychiatry.  Weiss testified that on February 14,
2000, one and a half years after the murder, he met with
defendant at the jail.  He also reviewed the criminal
investigation and discovery materials, the forensic
psychiatric hospital records, the jail medical records and
the Newark Beth Israel Hospital medical records from August
1998.  Based upon his examination of defendant and review of
the records, Weiss concluded that defendant was suffering
from paranoid-type schizophrenia and depression with
suicidal behaviors.  He indicated that he based his
diagnosis on defendant's reporting that he had "difficulty
thinking logically, difficulty maintaining a thought process
that flowed smoothly, bizarre delusions, that is [,] fixed
irrational ideas, and ... auditory hallucinations."  Weiss
determined that defendant suffered from those symptoms at
the time he gave his statement to Sabur based upon his
observation of defendant in February 2000 and defendant's
reporting that he had experienced the symptoms in August
1998.  Weiss indicated further that defendant's depression
was part of the paranoid schizophrenia.

. . .

The Newark Beth Israel Hospital records from August 1998
indicate that defendant had been given an anti-depressant,
Zoloft, but no anti-psychotic medication.  In Weiss'
opinion, the Zoloft did not affect defendant's ability to
voluntarily waive his rights, but the absence of the anti-

17

psychotic drug rendered defendant "more susceptible to making a statement that was less than voluntary, knowing and intelligent." Moreover, Weiss testified that the surgery to insert the tube in defendant's chest and the presence of I.V.'s were "at best, distractions, and, at worst, disabilities that increase one's susceptibility to outside influences like someone telling you to make a statement."

On cross-examination, Weiss acknowledged that he did not administer any objective tests to defendant to support his diagnosis of paranoid schizophrenia. He further indicated that while he accepts what a paranoid schizophrenic says for clinical purposes, "It doesn't mean that it's true." When told on cross-examination that defendant had summoned Sabur back to the hospital to talk, Weiss characterized that behavior as "bizarre."

Defendant's hospital records from August 1998 indicated that he was admitted for a suicide attempt but he had denied hallucinations or delusions. Nor did he report delusions or auditory hallucinations when he was examined by a psychiatrist after he was admitted. Weiss testified, however, that defendant told him he tried to kill himself because he heard voices telling him to do so.

After hearing the testimony and the arguments of counsel, the trial judge rendered a lengthy and detailed oral decision in which he concluded that defendant's statement was admissible because adequate <u>Miranda</u> warnings had been given and because defendant intelligently waived his rights and made the statement voluntarily. The judge found Weiss's opinion lacking in credibility, principally because Weiss based his diagnosis on a two-hour interview a year and a half after the murder, but never spoke to any of the physicians who treated defendant in August 1998 or the two experts who examined defendant for purposes of competency to stand trial. The judge noted that "[n]o other medical professional who treated the defendant over the past three years at Newark Beth Israel Hospital [in August 1998], Trenton Forensic Hospital, or in the Essex County Jail ... and examined the defendant on more [than one]occasion[] and for a longer period of time" found that defendant suffered from paranoid schizophrenia, delusions or hallucinations. Moreover, the judge found that on cross-examination Weiss acknowledged that accepting defendant's statements for clinical purposes does not mean that defendant's statements were true, and the judge expressed concern that Weiss left certain things out of his report that affected defendant's

18

credibility.  Finally, the judge noted that Weiss's opinion that defendant's weakened medical condition may have left him more susceptible to an involuntary statement was couched in the equivocal term "may have," rather than a reasonable probability of medical certainty.  In short, the trial judge rejected Weiss's opinion and conclusion that defendant was incapacitated to the extent that he could not knowingly and voluntarily waive his <u>Miranda</u> rights.  We agree.

It is well recognized that the Fifth Amendment of the United States Constitution protects against self-incrimination during custodial interrogations.  <u>Miranda v. Arizona</u>, <u>supra</u>, 384 U.S. at 444, [].  While the State argues that the hospital setting was not custodial, we are satisfied that under the circumstances presented, the interrogation was custodial in nature.

. . .

There is no dispute that defendant was advised of his <u>Miranda</u> rights and waived them at least three times, or that he signed one waiver form before making his statement.  The principal issue here is whether defendant's waiver was knowing, voluntary and intelligent.

> The voluntary waiver is based "on notions of due process."  <u>Dickerson v. U.S.</u>, 530 U.S. 428, 433, [] (2000).  The voluntariness test evolved "into an inquiry that was examines 'whether a defendant's will was overborne' by the circumstances surrounding the confession.  The due process test takes into consideration 'the totality of all the surrounding circumstances - both the characteristics of the accused and the details of the interrogation.'" <u>Id</u>. at 434, [] (citing <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226, [] (1973)).
>
> [<u>State v. Knight</u>, 369 N.J. Super. 424, 436 (App. Div. 2004).]

A valid waiver of rights is a prerequisite to the admissibility of a statement made by defendant.  <u>State v. McCloskey</u>, 90 N.J. 18, 29 (1982).  Waiver may be express or implied from the suspect's words or actions after <u>Miranda</u> warnings are read.  <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 [] (1979); <u>State v. Kremens</u>, 52 N.J. 303, 311 (1968).  The State must prove beyond a reasonable doubt that defendant has voluntarily, knowingly and intelligently

waived his Miranda rights.  State v. Adams, 127 N.J. 438, 447 (1992).

In applying the totality of the circumstances test to determine the voluntariness of the waiver, the factor to be considered include "the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved."  State v. Miller, 76 N.J. 392, 402 (1978); State v. Timmendequas, 161 N.J. 515, 617-18 (1999), cert. denied, 534 U.S. 858 [] (2001).  Defendant argues that the totality of the circumstances here are such that his statement could not be voluntary.

While the circumstances may not have been ideal, they did not necessarily render defendant's statement involuntary. Defendant is of at least average intelligence, having completed three years of college and been employed as a bank teller.  He knew his rights and exercised them on two occasions when he stopped answering questions and Sabur left the hospital.  Moreover, it was defendant who contacted Sabur and had him return to the hospital so that defendant could talk to him.  Once defendant accurately identified himself, he was able to state his date of birth, social security number and home address without difficulty, indicating that his memory was intact and that he was alert and responsive.

There is no evidence to indicate that Sabur was persistent, coercive or over-long in his questioning.  To the contrary, Sabur stopped questioning defendant when defendant said he was too tired and again later when defendant started to cry. Defendant initiated the third contact by paging the detective and requesting that he return to the hospital. "Fresh Miranda warnings are not necessary if the accused initiates conversation after invoking the right to silence." State v. Harvey, 121 N.J. 407, 418 (1990), cert. denied, 499 U.S. 931 [] (1991).  Moreover, defendant indicated he remembered his rights from the night before, understood them and waived them.  Ibid.

We agree with the trial judge's rejection of Weiss's testimony and his conclusion that defendant was able to and did, in fact, voluntarily, knowingly and intelligently waive his Miranda rights.

(Re U, October 8, 2004 Appellate Division Opinion at pp. 9-20, Da18-29).

Dandor again argues, in this federal habeas petition, that the admission of his allegedly involuntary and coerced statement at trial deprived him of due process.  Pursuant to the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment, a confession must be voluntary to be admitted into evidence.  See Dickerson v. United States, 530 U.S. 428, 433 (2000).  Miranda provides that the accused may waive his rights, but must do so "voluntarily, knowingly and intelligently".  Miranda, 384 U.S. at 475.

> To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized.  Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required.  He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.  Opportunity to exercise these rights must be afforded to him throughout the interrogation.  After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement.  But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

Miranda, 384 U.S. at 478-79.  The Miranda warnings are a
constitutional requirement.  Dickerson, 530 U.S. at 444.  "The
requirement that Miranda warnings be given does not, of course,
dispense with the voluntariness inquiry.  But ... '[c]ases in
which a defendant can make a colorable argument that a self-
incriminating statement was 'compelled' despite the fact that the
law enforcement authorities adhered to the dictates of Miranda
are rare.'"  Dickerson, 530 U.S. at 444.

"[T]he ultimate issue of 'voluntariness' is a legal question
requiring independent federal determination," and is thus not
subject to the § 2254(d) presumption of correctness.  Miller v.
Fenton, 474 U.S. 104, 109-110 (1985).

> The Supreme Court has made clear that a statement is
> involuntary when the suspect's "will was overborne in
> such a way as to render his confession the product of
> coercion." Arizona v. Fulminante, 499 U.S. 279, 288,
> 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In determining
> whether a statement is voluntary, Supreme Court
> precedent requires consideration of "the totality of
> all the surrounding circumstances--both the
> characteristics of the accused and the details of the
> interrogation." Dickerson v. United States, 530 U.S.
> 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000)
> (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226,
> 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). These
> surrounding circumstances include "not only the crucial
> element of police coercion, Colorado v. Connelly, 479
> U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986),"
> but may also include "the length of the interrogation,
> its location, its continuity, the defendant's maturity,
> education, physical condition, and mental health."
> Withrow v. Williams, 507 U.S. 680, 693, 113 S.Ct. 1745,
> 123 L.Ed.2d 407 (1993) (some internal citations
> omitted).

Lam v. Kelchner, 304 F.3d 256, 264 (3d Cir. 2002).  "[S]ubsidiary questions, such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the Miranda warnings, often require the resolution of conflicting testimony of police and defendant. The law is therefore clear that state-court findings on such matters are conclusive on the habeas court if fairly supported in the record and if the other circumstances enumerated in § 2254(d) are inapplicable."  Dickerson, 474 U.S. at 117.

In determining whether there has been a valid waiver of Miranda rights, a court must conduct a two-part inquiry under a totality of the circumstances standard.  Moran v. Burbine, 475 U.S. 412, 421 (1986).  First, the court looks to the voluntariness of the statement, and whether the waiver was freely and deliberately given as opposed to being obtained by coercion, intimidation, or deception.  Id.  Second, the court must consider whether the waiver was "knowingly and intelligently" made, that is, whether the accused was fully aware "both of the nature of the right being abandoned and the consequences of the decision to abandon it."  Id.

The "totality of the circumstances" approach is the clearly established federal standard applied to determine whether there has been a voluntary waiver of Miranda rights.  A court must take into account "both the characteristics of the accused and the

23

details of the interrogation." Schneckloth v. Bustamonte, 412
U.S. 218, 226 (1973).  This approach includes the evaluation of
the subject's age, education, experience, background, and
intelligence, and whether he has the capacity to understand the
warnings given him, the nature of his Fifth Amendment rights, and
the consequences of waiving those rights, the length of
detention, the repeated and prolonged nature of questioning, and
the use of physical punishment such as the deprivation of food or
sleep.[4]  Id.; see also Fare v. Michael C., 442 U.S. 707, 725
(1979); United States v. Swint, 15 F.3d 286, 289 (3d Cir. 1994).
It looks to the person's familiarity with the criminal justice
system, the timing of the Miranda warnings and the statement
given, and the length and nature of the interrogation and the
accompanying detention.  See United States v. Velasquez, 885 F.2d
1076, 1086 (3d Cir. 1989), cert. denied, 494 U.S. 1017 (1990);
United States v. Vasquez, 889 F. Supp. 171, 177 (M.D.Pa. 1995).
See also Yarborough v. Alvarado, 541 U.S. 652, 124 S.Ct. 2140,
2151 (2004)(the characteristics of the defendant can include the

---

[4]  In determining the voluntariness of the confession, New
Jersey state courts have traditionally assessed the totality of
the circumstances surrounding the arrest and interrogation,
including such factors as the accused's "age, education and
intelligence, advice as to constitutional rights, length of
detention, whether the questioning was repeated and prolonged in
nature and whether physical punishment of mental exhaustion was
involved."  State v. Miller, 76 N.J. 392, 402 (1978); see also
State v. Presha, 163 N.J. 304, 313 (2000).

defendant's age, education, and intelligence, as well as his prior experience with law enforcement).

Further, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 167 (1986); see also Arizona v. Fulminante, 499 U.S. 279, 288 (1991)(a statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion"); Lam, 304 F.3d at 264.  Absent police overreaching, which is causally related to the confession, "there is simply no basis for concluding that a state actor has deprived a criminal defendant of due process of law."  Connelly, 479 U.S. at 164.  Thus, beyond the necessary and crucial element of police coercion, courts look to both the characteristics of the accused and the circumstances of the interrogation in considering whether a confession is voluntary.  See, e.g., Withrow v. Williams, 507 U.S. 680, 693-94 (1993)(concluding that the voluntariness of the confession depends upon the totality of circumstances, including police coercion, length and place of interrogation, the accused's maturity, education, physical condition, intelligence, and mental health, as well as 'the failure of the police to advise the defendant of his rights to remain silent and to have counsel present during the custodial interrogation"); Schneckloth, 412

U.S. at 226 (the voluntariness of a statement may often depend on whether the accused's will was overborne, a question that logically turns on the characteristics of the accused).  The government "need prove waiver only by a preponderance of the evidence."  Connelly, 479 U.S. at 168.

This Court has carefully reviewed the record and finds that the totality of the circumstances in this case clearly weigh in favor of voluntariness, as determined by the state courts.  First, there is no evidence of coercive conduct on the part of the Detective Sabur.  Second, as fully discussed by the Appellate Division on direct appeal, as set forth above, the trial court determined that petitioner's confession was knowingly and intelligently made.

Having reviewed the relevant state court record, in particular the testimony and evidence adduced at the Miranda hearing, this Court finds that petitioner's statement was voluntarily and intelligently given.

Dandor was given Miranda warnings on three occasions and stated he understood them and waived them accordingly before he confessed.  His statement was given after he himself initiated the conversation with Sabur by paging him at 4:30 a.m.  There was no evidence that petitioner was deprived of food, sleep, or other physical needs that would otherwise serve to overbear a person's will.  Indeed, when Dandor told Sabur he was tired and when he started to cry, Sabur concluded his interview.

There also were no factors concerning petitioner's age and education, which would suggest that he did not understand his Miranda rights or the consequences of waiving those rights. Further, this Court agrees with the state court that there was no overreaching or objectively coercive police conduct that would have overborne petitioner's will under the circumstances here to make petitioner's confession involuntary. As stated above, there were no physical punishments inflicted on petitioner – he was not deprived of sleep and food and he was not physically threatened or harmed. Miranda warnings were given and petitioner waived those rights voluntarily and knowingly.

Moreover, there is no suggestion that Sabur used unnecessary or overbearing psychological tactics to extract a confession from petitioner. Consequently, after careful review of the record, this Court cannot conclude that the determination of the trial court in admitting petitioner's confession resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Williams v. Taylor, supra. The state courts applied the correct law and facts in reaching its determination that there was no Miranda violation, and that the statement was voluntarily, knowingly and intelligently given. Petitioner has failed to demonstrate that the state court opinion, when evaluated

27

objectively and on the merits, resulted in an outcome that cannot be reasonably justified.  <u>Matteo</u>, 171 F.3d at 891.  Therefore, the Court will deny federal habeas relief on this claim because the alleged violation of petitioner's Fifth and Fourteenth Amendment rights is substantively meritless.

B.  <u>State Sustained Its Burden of Proof</u>

Next, Dandor asserts that the State failed to sustain its burden of proof at trial.  Namely, Dandor alleges that there were no eyewitnesses, DNA, or other physical evidence linking him to the victim's death.  He also states that his statement to police included incorrect factual information that the victim was killed with a box cutter.

Dandor raised this claim on direct appeal.  The Appellate Division ruled:

> Prior to sentencing, defendant moved for a new trial on the ground that the verdict was against the weight of the evidence.  "[A] motion for a new trial is addressed to the sound discretion of the trial judge, and the exercise of that discretion will not be interfered with on appeal unless a clear abuse has been shown."  <u>State v. Russo</u>, 333 N.J. Super. 119, 137 (App. Div. 2000).  Our scope of review is limited to a determination of "whether the findings made by the trial court could reasonably have been reached on sufficient credible evidence present in the record."  <u>Id</u>. at 140 (quoting <u>State v. Locurto</u>, 157 N.J. 463, 472 (1999)).
>
> We have carefully reviewed the record in light of defendant's argument, and we are satisfied that the trial judge properly exercised his discretion in denying the motion for a new trial.  Clearly, there was more than sufficient evidence to support this verdict.

(Re U, October 8, 2004 Appellate Division Opinion at pp. 20-21, Da29-30).

The State argues here that Dandor's claim lacks substantive merit. Specifically, the State observes that there was no evidence in the record that any usable DNA evidence was found, and therefore, the State was not obligated to produce DNA evidence to prove its case at trial. Indeed, the lack of DNA evidence was noted by defense counsel at trial. Moreover, the lack of the murder weapon did not make the State's proofs less compelling, especially in light of the testimony that Dandor had surrendered a box cutter and knife case when he arrived at Newark Beth Israel Hospital, which was thereafter inadvertently discarded by hospital staff. Additionally, there was Dandor's confession, Brown's eyewitness identification of Dandor as the man exiting the church with blood dripping from his hand and on his shirt immediately after Mook had been stabbed. His clothing that he had upon entry to the hospital matched Brown's description of the clothing worn by the culprit. Dandor's heart rate became extremely high as witnessed by Nurse Sosnicki when the T.V. news broadcast the murder. Thus, there was more than sufficient direct and circumstantial evidence adduced at trial to support the verdict.

This Court finds, based on its review of the state court record, that the evidence was more than sufficient for a reasonable jury to easily find Dandor guilty of the charges beyond a reasonable doubt. The verdict clearly was not against the weight of the evidence, as determined by both the state trial

and appellate courts, and the verdict plainly did not perpetuate a miscarriage of justice.  Consequently, this Court finds no error of a constitutional dimension with respect to Dandor's second claim for relief.  Dandor has failed to show that the state court determination "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Williams, 529 U.S. at 412-13.  Therefore, this claim is denied.

C.   Claim As To Improper Expert Testimony by Nurse Witness

In this third claim for habeas relief, Dandor asserts that Nurse Sosnicki was improperly allowed to testify as an expert witness at trial with respect to the EKG monitor and the mechanical scientific procedure used to record Dandor's heart rate.  Dandor raised this claim on direct appeal.

The Appellate Division rejected this claim, finding:

Defendant argues for the first time on appeal that the trial court erred in allowing nurse Sosnicki to be qualified as an expert with respect to the EKG monitor and to testify as to "the mechanical-scientific procedure used to record the defendant's heartbeat."  We note initially that we will not reverse on the ground of an error not brought to the attention of the trial court unless the appellant shows plain error, that is, error "clearly capable of producing an unjust result."  R. 2:10-2.  A mere possibility of an unjust result will not suffice.  The possibility must be "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached."  State v. Macon, 57 N.J. 325, 336 (1971).

Sosnicki was called by the State as a fact witness and qualified as an expert in the field of nursing.  For a witness to give expert testimony, it must be shown that the witness has certain skills, knowledge or training in a technical area or one that is not common to the world.  Hake v. Manchester Tp., 98 N.J. 302, 314 (1985).  A nursing expert is limited to rendering a "nursing diagnosis," that is, identifying "signs and symptoms only to the extent necessary to carry out the nursing regimen rather than making final conclusions about the identity and cause of the underlying disease."  State v. One Marlin Rifle, 319 N.J. Super. 359, 369 (App. Div. 1999); N.J.S.A. 45:11-23(b).

Sosnicki testified to his factual observations and as an expert witness with respect to the care received by patients on the critical care unit.  Sosnicki also testified about defendant's punctured lung and the treatment he received for it.  He further testified as to the purpose of the EKG monitor and how it was attached to defendant.  Sosnicki was not asked his opinion, nor did he give it, respecting the significance of defendant's elevated heart beat.  He testified merely to his observation and the fact that it raised his suspicion.  We find nothing in Sosnicki's testimony that exceeded the bounds of his expertise.  He was properly qualified as a nursing expert to explain the monitoring devices and the treatment given to defendant.  There was no error in admitting Sosnicki's testimony. Much less plain error.

(Re U, October 8, 2004 Appellate Division Opinion at pp. 21-22, Da30-31).

The State again argues in its response to this habeas petition that this claim lacks substantive merit.  This Court agrees, and likewise rejects petitioner's claim for the following reasons.

Generally, issues as to the admissibility of evidence, as asserted by Dandor, are questions of state law and not subject for federal habeas review.  See Estelle v. McGuire, 502 U.S. 62, 68 (1991); Johnson v. Rosemeyer, 117 F.3d 104, 112-15 (3d Cir. 1997).  See also Keller v. Larkins, 251 F.3d 408, 416 n.2 (3d

Cir.), <u>cert</u>. <u>denied</u>, 534 U.S. 973 (2001).  Federal courts must afford the states deference in its determinations regarding evidence and procedure.  <u>See</u> <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986).  It is well-established that "a state court's misapplication of its own law does not generally raise a constitutional claim.  The federal courts have no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." <u>Smith v. Horn</u>, 120 F.3d 400, 414 (3d Cir. 1997)(citations omitted), <u>cert.</u> <u>denied</u>, 522 U.S. 1109 (1998).

However, evidentiary rulings may violate due process when the petitioner "was denied fundamental fairness at trial." <u>Hutchins v. Hundley</u>, 1991 WL 167036 at *4 (D.N.J. Aug. 22, 1991)(Wolin, J.)(citations omitted); <u>see</u> <u>also</u> <u>Kontakis v. Beyer</u>, 19 F.3d 110, 120 (3d Cir. 1994), <u>cert.</u> <u>denied</u>, 513 U.S. 881 (1994); <u>Lisenba v. California</u>, 314 U.S. 219, 228, 236 (1941)(holding that state court's evidentiary rulings may form the basis for habeas relief when they "so infused the trial with unfairness as to deny due process of law").

The appropriate inquiry is "whether the claimed error of law is a fundamental defect which inherently results in a complete miscarriage of justice or in an omission inconsistent with the rudimentary demands of fair procedure." <u>Hutchins</u>, 1991 WL 167036 at *4 (citing <u>United States v. De Luca</u>, 889 F.2d 503, 506 (3d Cir. 1989), <u>cert.</u> <u>denied</u>, 496 U.S. 939 (1990))(other citations

omitted).   The Supreme Court has further stated that "an otherwise valid conviction should not be set aside if the reviewing court may confidently say on the whole record that the constitutional error was harmless beyond a reasonable doubt." Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986).   An error is not harmless if "it aborts the basic trial process or denies it altogether."   Hutchins, 1991 WL 167036 at *5 (citing Rose v. Clark, 478 U.S. 570, 578 n.6 (1986)).

Here, the admission of Nurse Sosnicki's expert testimony at trial bore on the issue of Dandor's medical treatment and his observation and reading of the EKG monitor.   Sosnicki was duly qualified as an expert in the nursing care he provided for petitioner and to explain the EKG monitor.   Consequently, the testimony and qualification as an expert was permissible under state law and rules of evidence, and did not amount to an error of constitutional dimension.   Dandor has not shown that the trial process was fundamentally unfair, or that the state trial court evidentiary rulings allowed the admission of any improper evidence.   Further, Dandor has not demonstrated, as required under 28 U.S.C. § 2254(d), that the actions of the state court in this regard resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or resulted in a decision based on an unreasonable determination of the facts.

33

D.   Ineffective Assistance of Counsel Claims

    Dandor asserts that both his trial counsel and appellate counsel were ineffective in violation of his Sixth Amendment right to effective assistance of counsel.  The "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), is the standard for ineffective assistance of counsel as enunciated in Strickland v. Washington, 466 U.S. 668 (1984).  Under Strickland, a petitioner seeking to prove a Sixth Amendment violation must demonstrate that his counsel's performance fell below an objective standard of reasonableness, assessing the facts of the case at the time of counsel's conduct.  See id. at 688-89; Jacobs v. Horn, 395 F.3d 92, 102 (3d Cir. 2005); Keller v. Larkins, 251 F.3d 408, 418 (3d Cir.), cert. denied, 534 U.S. 973 (2001).  Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Strickland, 466 U.S. at 688.  "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."  Id.

    If able to demonstrate deficient performance by counsel, the petitioner must also show that counsel's substandard performance actually prejudiced his defense.  See Strickland, 466 U.S. at 687.  Prejudice is shown if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability

34

is a probability sufficient to undermine confidence in the outcome." Id. at 694.  The reviewing court must evaluate the effect of any errors in light of the totality of the evidence. See id. at 695-96.  Thus, the petitioner must establish both deficient performance and resulting prejudice in order to state an ineffective assistance of counsel claim.  See id. at 697; see also Jacobs, 395 F.3d at 102; Keller, 251 F.3d at 418.

Finally, the Supreme Court has held that the Due Process Clause of the Fourteenth Amendment guarantees a defendant the effective assistance of counsel on a first direct appeal as of right.  See Evitts v. Lucey, 469 U.S. 387 (1985).  Claims of ineffective assistance of appellate counsel are evaluated under the Strickland standard.  See Lewis v. Johnson, 359 F.3d 646, 656 (3d Cir. 2004); Wright v. Vaughn, 2004 WL 1687865 at *6, n. 10 (E.D.Pa. July 26, 2004).  Appellate counsel does not have a duty to advance every nonfrivolous argument that could be made, see Jones v. Barnes, 463 U.S. 745, 754 (1983), but a petitioner may establish that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).

Moreover, in order to prevail on a claim that appellate counsel was ineffective, a petitioner must show not only that counsel's performance fell below an objective standard of reasonableness, but also that there was a reasonable probability,

but for counsel's deficiency in raising the arguments on appeal, that the conviction would have been reversed on appeal.  See Buehl v. Vaughn, 166 F.3d 163, 173-74 (3d Cir.), cert. dismissed, 527 U.S. 1050 (1999).

1.  *Trial Counsel*

Dandor asserts several claims of trial counsel ineffectiveness.  First, he contends that trial counsel was ineffective for failing to adequately cross-examine the State's witnesses regarding the lack of DNA and physical evidence linking Dandor to the victim's death.  Second, Dandor claims that trial counsel was ineffective for inducing petitioner to testify about his mental state at the time he tried to commit suicide, but counsel's efforts caused Dandor to change his mind and not testify.

Dandor raised these claims in his state PCR petition, which was denied.  On appeal from denial of Dandor's state PCR petition, the Appellate Division found, after reciting the Strickland standard, as follows:

> Defendant argues that defense counsel should have conducted a more extensive cross-examination of Detective Rasheed Sabur to emphasize the absence of DNA evidence tying him to the murder.  He also claims that defense counsel should have called his landlady as a character witness.  Judge Ravin held, however, that these actions were "clearly tactical" and did not fall "below a level of reasonable competence." The judge further found that, even assuming that counsel was deficient, defendant failed to show that the outcome of the trial would have been different if defense counsel had more extensively cross-examined Detective Sabur regarding the absence of DNA evidence, or called defendant's landlady as a character witness.  We are convinced that the record fully supports the judge's findings.

36

> Defendant additionally argues that counsel was deficient because his attorney "induced" him not to testify at trial. In or view, the contention is without merit.  At the trial, the judge informed defendant that he had a right to testify.  The judge asked defendant if he had spoken to his attorney about testifying and defendant said that they had discussed the matter.  The judge asked defendant if he understood that it was his "right to decide whether or not [he] should testify or not."  Defendant said that he understood.  Defendant then told the judge that he did not want to testify.  The judge found that defendant had voluntarily elected not to testify.

(Re W, October 8, 2008 Appellate Division Opinion at pp. 7-8).

In his habeas petition, Dandor has made no showing to contradict the state court rulings that his trial counsel's performance was not deficient in any way.  Moreover, even if Dandor could show that the actions (or inactions) of his counsel were deficient, he cannot satisfy the prejudice prong under Strickland.  Both the PCR court and Appellate Division found that there was no merit under Strickland's two-prong test to support Dandor's claims of ineffectiveness of trial counsel.  In short, Dandor simply has not demonstrated what counsel could have done that would have served to change the outcome this matter.

This Court is satisfied from its review of the pertinent state court record that there was ample evidence to support the state court rulings on this issue.  Indeed, this Court's careful review of the state court transcripts reveals that trial counsel's performance was competent given the overwhelming State evidence against Dandor.  Thus, Dandor can not argue that trial counsel's performance was deficient.  This Court also finds that Dandor has not established a constitutional violation; nor has he

shown, as required under 28 U.S.C. § 2254(d), that the actions of the state courts resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court in Strickland, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Therefore, this ineffective assistance of trial counsel claim for habeas relief will be denied.

2. *Appellate Counsel*

Next, Dandor argues that his appellate counsel failed to provide petitioner with any status letter or copies of the appeal brief beforehand, thus depriving Dandor of the opportunity to assist in the preparation of his direct appeal. Specifically, Dandor states that he would have prepared an argument challenging the trial court's refusal to grant trial counsel's request to charge lesser included offenses to murder. (Petition at ¶ 12G). Based on the state court record and state court factual findings, this Court finds no merit to Dandor's claim. Indeed, this Court's review of the state court record confirms that Dandor's appellate counsel prepared a very thorough brief on behalf of petitioner.

Moreover, Dandor raised this issue in his state PCR petition, which was denied. On appeal, the Appellate Division

found no merit to petitioner's claim of ineffective assistance of appellate counsel.

Defendant further argues that he was denied the effective assistance of appellate counsel.  He asserts that counsel did not provide him with correspondence, copies of the brief, paperwork or transcripts and, therefore, he was not able to assist counsel in the preparation of the appellate brief.  Judge Ravin found, however, that defendant failed to show that appellate counsel was deficient in his handling of the appeal, or that the result of the appeal would have been different if appellate counsel had given defendant an opportunity to assist in the preparation of the brief.  The record supports that finding.

(Re W, October 8, 2008 Appellate Division Opinion at pp. 8-9).

Here, Dandor has not shown that his appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).  He has simply demonstrated that counsel failed to raise non-meritorious claims which had no reasonable probability in reversing Dandor conviction on appeal. See Buehl, 166 F.3d at 173-74.

Therefore, this Court finds that petitioner's ineffective assistance of appellate counsel claim fails because he cannot demonstrate either deficient performance or any resulting prejudice.  Accordingly, this Court will deny this claim pursuant to 28 U.S.C. § 2254(b)(2), because it is completely lacking in merit.

V.   CERTIFICATE OF APPEALABILITY

This Court next must determine whether a certificate of appealability should issue.  See Third Circuit Local Appellate Rule 22.2.  The Court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  For the reasons discussed above, this Court's review of the claims advanced by petitioner demonstrates that he has failed to make a substantial showing of the denial of a constitutional right necessary for a certificate of appealability to issue.  Thus, this Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

## CONCLUSION

For the above reasons, this Court finds that the § 2254 habeas petition must be denied, and a certificate of appealability will not issue.   An appropriate Order follows.


  /s/ Katharine S. Hayden
KATHARINE S. HAYDEN
United States District Judge

DATED: 2/22/11